**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

|  |  |
|---|---|
| M.R.,<br><br>        Plaintiff,<br><br>    v.<br><br>STOCKTON UNIVERSITY, et al.,<br><br>       Defendants. | Civil No. 18-11431 (RMB/JS) |
| K.S.,<br><br>        Plaintiff,<br><br>    v.<br><br>STOCKTON UNIVERSITY, et al.,<br><br>       Defendants. | Civil No. 18-11635 (RMB/JS)<br><br>**OPINION** |

**APPEARANCES:**

FUGGI LAW FIRM, P.C.
By: Robert R. Fuggi, Jr., Esq.; Jonathan M. Penney, Esq.;
   Peter S. Pascarella, Esq.
47 Main Street, P.O. Box 1808
Toms River, New Jersey 08754
   Counsel for Plaintiffs M.R. and K.S.

OFFICE OF THE ATTORNEY GENERAL OF NEW JERSEY
By: Michael R. Sarno, Deputy Attorney General
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 116
Trenton, New Jersey 08625
   Counsel for Defendant Stockton University

GREENBAUM, ROWE, SMITH & DAVIS, LLP
By: John D. North, Esq.; Jemi Goulian Lucy, Esq.;
    Irene Hsieh, Esq.
P.O. Box 5600
Woodbridge, New Jersey 07095
    Counsel for Defendant Stockton University

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
By: Kurt W. Krauss, Esq.; Susan Karlovich, Esq.
200 Campus Drive
Florham Park, New Jersey 07932
    Counsel for Defendant Zachary Madle

THOMAS MASCIOCCHI, ESQ. P.C.
By: Thomas G. Masciocchi, Esq.
520 Evesham Road
Glendora, New Jersey 08029
    Counsel for Defendant Zachary Madle

ZARWIN, BAUM, DEVITO, KAPLAN, SCHAER & TODDY, P.C.
By: Timothy P. Mullin, Esq.
309 Fellowship Road, Suite 200
Mt. Laurel, New Jersey 08054
    Counsel for Defendant Pi Kappa Phi Fraternity, Inc.

**RENÉE MARIE BUMB**, UNITED STATES DISTRICT JUDGE:

Plaintiffs M.R. and K.S. ("Plaintiffs") bring these actions against Defendants Stockton University ("Stockton"), Zachary Madle ("Madle"), and Pi Kappa Phi Fraternity, Inc. ("PKP")(collectively, "Defendants"), alleging that, while they were students at Stockton, they were each sexually assaulted twice by Madle. Specifically, Plaintiff M.R. alleges that Madle sexually assaulted her twice in February 2017 in her Stockton dorm room, and that Madle filmed and posted one of the sexual assaults on Snapchat. Separately, Plaintiff K.S.

2

alleges that Madle sexually assaulted her twice at the Stockton PKP fraternity house in October and November 2017.

Although filed separately, the Plaintiffs' respective complaints assert the same twenty-three (23) counts, alleging causes of action under Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681, et seq. (Counts 1-2), Section 1983 of the Civil Rights Act, 42 U.S.C. § 1983 (Counts 3-4), the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act ("Clery Act"), 20 U.S.C. § 1092 (Count 5),[1] personal injury tort claims (Counts 6-13), as well as various derivative claims (Counts 14-23). See Plaintiff M.R.'s Complaint (the "M.R. Complaint") [M.R. Dkt. No. 1]; Plaintiff K.S.'s Complaint (the "K.S. Complaint")[K.S. Dkt. No. 1].

This matter now comes before the Court upon Motions to Dismiss, filed by Stockton and PKP (collectively, the "Moving Defendants")[See M.R. Dkt. Nos. 43, 44; K.S. Dkt. Nos. 33,

---

[1] In response to Defendants' Motions to Dismiss, Plaintiffs conceded that the Clery Act does not allow for a private cause of action and voluntarily withdrew Count 5 of the Complaint. See Plaintiff M.R.'s Brief in Opposition to the Motions to Dismiss ("Pl. M.R.'s Opp. Br.") [M.R. Dkt. No. 56], at 53-54; Plaintiff K.S.'s Brief in Opposition to the Motions to Dismiss ("Pl. K.S.'s Opp. Br.")[K.S. Dkt. No. 43], at 51. Therefore, the Court will not address Plaintiff's Clery Act claim in this Opinion.

34].[2]  Although the Court accepts all of Plaintiffs' disturbing allegations as true for purposes of these motions, the Court is constrained by legal precedent mandating dismissal of the claims against the Moving Defendants.  For the reasons set forth herein, the Moving Defendants' Motions to Dismiss will be **GRANTED,** and Plaintiffs' claims against the Moving Defendants will be **DISMISSED WITHOUT PREJUDICE.**  The Court, however, will allow Plaintiffs thirty (30) days to file amended complaints, addressing the deficiencies discussed in this Opinion.[3]

---

[2] The only Defendant who has not filed a Motion to Dismiss is Zachary Madle.  Relevantly, on September 27, 2018, Grand Jurors of the State of New Jersey for Atlantic County issued Indictment No. 18-09-1609-INV, charging Madle with three third-degree crimes (invasion of privacy by recording a sex act without knowing consent, invasion of privacy by disclosing a sex act without knowing consent, and aggravated criminal sexual contact).  These charges stem from the incidents alleged in one of the cases presently before this Court, M.R. v. Stockton Univ., Civ. No. 18-11431 (RMB/JS).  On December 4, 2018, U.S. Magistrate Judge Joel Schneider issued an Order [M.R. Dkt. No. 46] staying the proceedings in three cases before this Court involving Defendant Madle (Civ. Nos. 18-11431, 18-11635, 18-15651), pending the outcome of the Motions to Dismiss filed by the other Defendants.  Accordingly, this Court notes that the stay expires, in the two cases addressed herein, upon the Court's issuance of this Opinion and the corresponding Order.

[3] This is the Court's fourth decision resolving various motions to dismiss in the nine related "Stockton cases" currently pending before this Court.  This Court's Opinion contains some substantially similar reasoning to portions of the prior decisions issued in D.N. v. Stockton Univ., Civ. No. 18-11932 (RMB/JS), 2019 WL 2710500 (D.N.J. June 28, 2019), D.D. v. Stockton Univ., Civ. No. 18-13506 (RMB/JS), 2019 WL 3369709 (D.N.J. July 26, 2019), and S.U. v. Stockton Univ., Civ. No. 18-12145 (RMB/JS), 2019 WL 3417324 (D.N.J. July 29, 2019).

I.    **FACTUAL BACKGROUND**

In their respective complaints, Plaintiffs describe the
grave details of the alleged sexual assaults.  As averred, in
2017, Plaintiffs were both first-year students at Stockton,
living in university housing, when they were sexually assaulted
by Defendant Madle.  According to Plaintiffs, Madle had
graduated in 2015 from Stockton, where he was a member of PKP.
At the time of the incidents described in the complaints, Madle
was a bartender at the Flow House in Wildwood, New Jersey.

A.  *M.R. v. Stockton*

On the evening of February 9, 2017, Plaintiff M.R. was
introduced to Defendant Madle while attending a "invitation
only" party, along with her friend K.M., at PKP's off-campus
fraternity house in Egg Harbor City, New Jersey. See M.R.
Compl. at ¶¶ 13, 17.  As PKP did not allow students to bring
their own alcohol to the house, Plaintiff M.R. drank "'Jungle
Juice,' a mixture of mostly vodka mixed with Fruit Punch that
was provided by the fraternity house." Id. at ¶¶ 14-15.  M.R.
left the PKP party on a shuttle bus, accompanied by Defendant
Madle and his friend, who both stayed in M.R.'s Stockton dorm
room overnight. Id. at ¶ 19.

The next morning, around 9:30 a.m., "Plaintiff woke up
with a sore vagina, and found [] Madle and his friend still in
her dormitory room." See M.R. Compl. at ¶ 20.  M.R. states that

she was upset that Madle and his friend were still in her room and asked both to leave. Id. at ¶ 21. Although Madle and his friend "insisted that they all get breakfast together," they finally left the dorm in an Uber after Plaintiff "made it clear she wanted [Madle] and his friend to leave." Id. at ¶¶ 21-23. Plaintiff M.R "later learned from K.M. that [] Madle had non-consensual sex with M.R. while she had been incapacitated." Id. at ¶ 24.

On February 14, 2017, M.R. texted with Madle "throughout the day getting to know each other." See M.R. Compl. at ¶ 26. Later that evening, around midnight, Madle came over to M.R.'s dormitory, where she registered Madle as a guest, so he would not get a ticket for parking on campus. Id. at ¶¶ 28, 30. Once in M.R.'s dorm room, Madle showed her that he had brought two bottles of Stoli Vodka, as well as "eight ounce cups and small cans of ice tea and lemonade." Id. at ¶¶ 29, 31. Using these items, Madle "made and mixed all of the drinks." Id. While sitting on her bed, M.R. told Madle that "she 'wanted to remember this time' because it was Valentine's Day," to which Madle replied "we'll see." See M.R. Compl. at ¶ 32. Plaintiff states that she found this comment to be "very odd." Id.

M.R. drank about two to three cups of white wine and repeatedly declined Madle's requests that she drink the mixed vodka drink he had prepared for her. Id. at ¶ 33. M.R. alleges

that when she left her room to use the bathroom, Madle followed her out into the hallway and waited outside the bathroom stalls. Id. at ¶ 34. However, Plaintiff states that Madle did not follow her out to the hallway the next time she used the bathroom, "which allowed [] Madle the opportunity to spike/drug the Plaintiff's drink." Id. at ¶ 35.

Upon returning from the bathroom, Madle turned away while M.R. changed clothing for bed. However, after M.R. was finished changing, Madle "grabbed her hands and pulled her towards him and kissed her," then gave M.R. another drink. Plaintiff states that her last memory is of "kissing [Madle] on the edge of her bed before she blacked out as she believed was drugged. [Madle] then took of the Plaintiff's clothing while she was unconscious and sexually assaulted/raped her." Id. at ¶ 40. While M.R. was unconscious, Madle also "took a video of the sexual assault and rape on the phone app 'Snapchat'" and "posted the videos of the sexual assault on his Snapchat account." Id. at ¶ 41. These videos were "available for 24 hours for the public to view." Id. at ¶ 42.

The next morning, "Plaintiff woke up naked, confused, choking and covered in vomit." See M.R. Compl. at ¶ 43. M.R. checked her phone and saw text message from Madle, in which he fabricated a story "that someone tried to break in to the Plaintiff's dormitory and while chasing them away he became

locked out of the dormitory." Id. at ¶ 44.  Madle had taken his

backpack, but left the alcohol, iced tea cans, and cups. Id. at

¶ 45.  While using her phone, Plaintiff came across Madle's

"Snapchat stories," which included two videos of M.R. "still

wearing her bra and panties, but in the last video [M.R.] was

completely naked."  Id. at ¶ 46.

After viewing the videos in Madle's snapchat stories,

"M.R. realized she had been sexually assaulted/raped" and began

texting her friends for help. See M.R. Compl. at ¶¶ 47, 53.

One of M.R.'s friends, B.C., left class, joined M.R. at her

dormitory, and reported the sexual assault to Beth Mancuso,

M.R.'s Residential Advisor. Id. at ¶ 48.  In turn, Mancuso

reported the sexual assault to Darius Edwards, an official in

Stockton's housing department, who responded to the report,

along with an unnamed female Title IX coordinator. Id. at ¶¶

49-50. The housing department also contacted the Stockton

Police Department, which launched an investigation into the

sexual assault. Id.

B.C. drove M.R. to Atlanticare, where a rape kit was

performed. See M.R. Compl. at ¶¶ 52, 54. The tests associated

with the rape kit matched Madle's DNA and also showed that M.R.

had tested positive for Gonorrhea, a sexually transmitted

disease that Plaintiff allegedly contracted from Madle. Id. at

¶¶ 56-57. Plaintiff states that two police detectives spoke with her after the examination was completed. Id. at ¶ 58.

Upon returning from the hospital on February 15, 2018, M.R. alleges that Darius Edwards proposed the idea of M.R. withdrawing for the remainder of the semester. See M.R. Compl. at ¶ 63. Meanwhile, M.R. contends that Detective Anthony Lacovara from Stockton's Police Department "stated to the Plaintiff that this incident was not the first incident involving Pi Kappa Phi." Id. at ¶ 64. Detective Lacovara also contacted Stacey Rose, Stockton's Assistant Director of the Office of Student Rights & Responsibilities and set up a meeting between Rose and M.R. Id. at ¶ 65. At that meeting, Rose allegedly "apologized for what M.R. was forced to go through, and offered to ban [] Madle from Campus," which M.R. agreed to. Id. at ¶ 66.

Plaintiff M.R. alleges that following the sexual assault, she "began failing her classes as she struggled to deal with pain, anguish, and desires to commit suicide as a result of the sexual abuse she suffered." M.R. Compl. at ¶ 67. As a result of her failing grades, Stockton eventually placed M.R. on academic probation, offering her the opportunity to return at a later date. Id. at ¶ 68. On July 6, 2018, Plaintiff commenced this action against Defendants.

**B.  *K.S. v. Stockton***

On the evening of October 20, 2017, Plaintiff K.S. met Defendant Madle while attending a "invitation only" party, along with her friend J.K., at PKP's off-campus fraternity house in Egg Harbor City, New Jersey. See K.S. Compl. at ¶¶ 13, 19.  While at the party, K.S. consumed the "jungle juice," which K.S. describes as "a mixture of Everclear, Vodka, or other available liquors, mixed with Fruit Punch that was provided by the fraternity house which was dispensed from a Gatorade cooler." Id. at ¶ 14.

K.S. "spent the early part of the party dancing, talking, and kissing with [] Madle and J.K." See K.S. Compl. at ¶ 21. According to K.S., "at some point in the evening [] Madle pulled K.S. and J.K. into one of the bedrooms of the fraternity house," where the three "began talking which led to kissing on the bed." Id. at ¶¶ 22-23.  K.S. alleges that "without consent, Defendant Madle began attempting to have sex with the girls, specifically K.S. while [she] was intoxicated." Id. ¶ 24.  K.S. states that Madle "grabbed [her] by the waist and threw her on the bed," and "began to take off her clothes, first her shirt, then her pants and underwear." Id.

K.S. alleges that "Madle then tried to have sex with [K.S.] without the use of a condom" and "attempted to force his penis into K.S. without a condom and without consent." See K.S.

Compl. at ¶ 25. K.S. contends that she "had to push Madle off of her to stop him from having unprotected sex with her" and "was able to get Defendant Madle to reluctantly wear a condom although she was intoxicated." Id. at ¶ 26. "[O]nce the sexual relations began, Defendant Madle began to become physically abusive and grow more and more physically aggressive. He began to hit, bite, and choke Plaintiff K.S. without her consent. She told Defendant Madle to 'Stop' but he did not." Id. at ¶ 27. Plaintiff states that she eventually "blacked out" and the "last thing she remembers is being violently chocked [sic], hit, and painfully fingered vaginally by Defendant Madle." Id. at ¶ 31. Following the sexual assault, K.S. "ran out of the room... in such a hurry that she forgot one of her shirts, a black laced top." Id. at ¶ 32. K.S. later learned that J.K. had run out of the room in the midst of the sexual assault. Id. at ¶ 30. K.S. alleges that she "suffered physical injury from [Madle's] violent assault." Id. at ¶ 29. After returning to her dorm room, K.S. took photographs of the markings left on her body that resulted from the sexual assault. Id. at ¶ 37.

The day after the alleged assault, Madle texted K.S. a sexually explicit meme, about how Madle "wouldn't let go until he [had] ejaculated." See K.S. Compl. at ¶ 38. Days later, K.S. responded to Madle's text, inquiring whether Madle could

11

locate her missing shirt, which he stated that he could not because he was out of town. Id. at ¶ 40. K.S. once again texted Madle on November 9, 2017, asking whether Madle would be at the fraternity house the following night. Id. at ¶ 41. When Madle responded affirmatively, K.S. stated that they could find her shirt. Id.

On the night of November 9, 2017, into the early morning hours of November 10, 2017, K.S. attended a party at the PKP house with J.D., another friend. See K.S. Compl. at ¶ 42. Plaintiff states that "she saw Madle, but was able to avoid him. Id. at ¶ 43. Eventually, Madle approached K.S. while she was standing outside the house with J.D., but when K.S. rebuffed his advances, "Madle turned his focus and attention to J.D., which made K.S. nervous because she was clearly heavily intoxicated due to drinking the fraternity's 'jungle juice.'" Id. at ¶ 48.

K.S. observed Madle "leading J.D. into the same... bedroom in which she had been sexually assaulted, physically abused, and raped." See K.S. Compl. at ¶ 49. Deciding that "she could not allow J.D. to suffer the same fate that she did with Madle," K.S. followed them "to prevent J.D. from being raped." Id. at ¶ 50. After K.S. entered the room, where Madle had J.D. on his lap, K.S. told Madle that J.D. was "too drunk" and he should leave her alone. Id. at ¶ 52. "Madle's response was to

get up and push K.S. violently against the wall" and "began
kissing and touching K.S.'s breasts and butt." Id. at ¶¶ 52-
53.  When K.S. demanded that Madle "stop," he "returned to the
bed and pulled J.D. back onto his lap." Id.  When K.S.
attempted to call an Uber to take herself and J.D. back to
their dorms, Madle "grabbed both girls' phones and threw them
against the wall." Id. at ¶ 55.

Determined to prevent Madle from taking advantage of an
intoxicated J.D., K.S. "went back over to the bed and tried to
pull J.D. off of Madle."  See K.S. Compl. at ¶ 56.  K.S. states
that her actions made Madle "extremely angry," who then
"forcibly grabbed K.S. on the bed and got on top of her and
said to her 'If I can't have her, I'll have you." Id. at ¶ 57.
K.S. alleges that Madle "pulled [her] into the bathroom against
her will, and then "locked the door and began to pull her pants
down and rape [her]." Id. at ¶¶ 58-59.  Although K.S. "tried
to tell Madle that she was on her period," Madle "forced [K.S.]
to remove her tampon," and then "pushed K.S.'s head against the
mirror and began to forcibly have sex with K.S. from behind
without her consent." Id. at ¶¶ 60-61.

K.S. states that "she cried throughout the entirety of the
rape at the hands of Madle," which lasted approximately ten
minutes, and "told him 'No.'" See K.S. Compl. at ¶ 63.
According to K.S., she "was fearful because Madle was not

wearing a condom during the rape" and K.S. "did not use birth control and was fearful this attack could have led to her becoming pregnant." Id. at ¶ 62. Upon finishing, Madle allegedly told K.S., "This is done." Id. at ¶ 64.

K.S. alleges that, once back at her dorm, she reported the rape to her friends immediately after it happened. See K.S. Compl. at. ¶ 67. K.S. alleges that a week later, C.A., the PKP member whose room was used for the sexual assaults, "attempted to apologize to K.S. for what happened" and "stated that Madle would be banned from future parties, because of his out of control conduct." Id. at ¶ 68. According to K.S., she "has been in regular therapy since these incident[s] and she has suffered physical, physiological, and emotional trauma as a result of the rape and sexual assault." Id. at ¶ 69. K.S. adds that she has reported the sexual assault and rape to "the proper authorities," see id. at ¶ 69, but does not specify when or to whom. On July 13, 2018, Plaintiff commenced this action against Defendants.

## II.  LEGAL STANDARD

To withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(quoting Bell Atlantic Corp. v. Twombly, 550

U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 662. "[A]n unadorned, the defendant-unlawfully-harmed-me accusation" does not suffice to survive a motion to dismiss. Id. at 678. "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).

In reviewing a plaintiff's allegations, the district court "must accept as true all well-pled factual allegations as well as all reasonable inferences that can be drawn from them, and construe those allegations in the light most favorable to the plaintiff." Bistrian v. Levi, 696 F.3d 352, 358 n.1 (3d Cir. 2012). When undertaking this review, courts are limited to the allegations found in the complaint, exhibits attached to the complaint, matters of public record, and undisputedly authentic documents that form the basis of a claim. See In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997); Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993).

**III. DISCUSSION**

In their respective motions to dismiss, the Moving
Defendants set forth various arguments for dismissal.  Stockton
argues that Plaintiff cannot maintain tort claims against
Stockton because Plaintiff failed to serve notice under the New
Jersey Tort Claims Act ("TCA"), and that Plaintiff fails to
adequately allege Title IX and § 1983 claims.  Additionally,
both Stockton and PKP argue that Plaintiff cannot pursue claims
under a theory of vicarious liability or respondeat superior.
Based on the manner in which the allegations are currently pled
in the Complaint, the Court must rule in favor of the Moving
Defendants.

### A. *Personal Injury Claims (Tort Claims Act)*

First, Stockton argues that Plaintiffs' personal injury
claims against the university must be dismissed for failure to
meet the TCA's notice of claim requirement.  The TCA imposes
certain limitations on the tort liability of a New Jersey
public entity and of a New Jersey public employee. See N.J.S.A.
59:1-2; N.J.S.A. 59:2-1; N.J.S.A. 59:3-1. Of relevance to this
action, the TCA precludes actions against a public entity or
its employees when a plaintiff has failed to comply with its
notice of claim provision. See Coreas v. McGuire, 2010 WL
1849939, at *2 (D.N.J. May 7, 2010)(citing N.J.S.A. 59:8-3;

16

N.J.S.A. 59:8-8). Indeed, "[a] suit will be dismissed if the claimant did not provide a notice of claim to the entity within ninety days of the 'accrual of a cause of action.'" Davis v. Twp. of Paulsboro, 371 F.Supp.2d 611, 618 (D.N.J. 2005).

In this matter, neither Plaintiff has addressed the merits of Stockton's argument on this point nor claimed that they have complied with the TCA. Therefore, the Court must dismiss the personal injury claims against Stockton. Additionally, the Court notes that any effort to amend the complaints to remedy that issue would be futile, because Plaintiffs' failure to file the mandatory notice of claims bars them from proceeding with personal injury tort claims against Stockton.

B. *Title IX and § 1983 Claims*

Second, Stockton argues that Plaintiffs fail to state a claim under Title IX and Section 1983. The United States Supreme Court has held that Title IX "implies a private right of action to enforce its prohibition on intentional sex discrimination." Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 173 (2005)(emphasis added). To that end, "retaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination encompassed by Title IX," because retaliation is "by definition, an intentional act." See id. at 173-174. Meanwhile, to state a claim under § 1983, Plaintiffs must

allege that the school purposefully discriminated against them and treated them differently than others similarly situated. See Keel v. Delaware State Univ. Bd. of Trustees, 2019 WL 494621, at *7 (D. Del. Feb. 8, 2019).

A private Title IX and § 1983 claim may also exist against a public school in cases of student-on-student harassment, but "only where the funding recipient is deliberately indifferent to sexual harassment, of which the recipient has actual knowledge, and that harassment is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 650 (1999)(emphasis added). Indeed, damages may not be recovered unless a school official "who at a minimum has authority to institute corrective measures on the [school's] behalf has actual notice of, and is deliberately indifferent" to the alleged misconduct. See Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 277 (1998).

"Deliberate indifference claims impose a significant burden on the plaintiff and consequently rarely proceed beyond a motion to dismiss." Saravanan v. Drexel Univ., 2017 WL 5659821, at *7 (E.D. Pa. Nov. 24, 2017). Under Title IX, deliberate indifference requires "a response (or failure to

respond) that is clearly unreasonable in light of the known circumstances." Keel, 2019 WL 494621, at *6. Furthermore, the Supreme Court has held that it would "frustrate the purposes" of Title IX to permit a damages recovery "based on principles of respondeat superior or constructive notice, i.e., without actual notice" to a school official. See Gebser, 524 U.S. at 285.

In this case, it appears that Plaintiffs' Title IX and § 1983 causes of action are based on failure to further investigate the alleged sexual assaults and take actions against PKP and Madle. Plaintiffs, however, have not alleged that the Madle was a Stockton student at the time of the assaults or that Stockton had control over him or PKP (which was operating off-campus without University recognition.) The Court cannot assume that Stockton had substantial control over or the ability to discipline Madle or PKP. Furthermore, Plaintiff K.S. never alleges that she reported either of Madle's alleged sexual assaults to any Stockton official, meaning that Stockton did not have "actual notice" of those assaults. Although M.R. clearly alleges that she reported the sexual assaults involving Madle to Stockton, she does not allege that she actually initiated a Title IX proceeding or that Stockton officials acted unreasonably or indifferently during the process.

This is not to say that this Court condones Stockton's failure to do more to protect Plaintiffs from the dangers of this off-campus fraternity. However, in this instance, the Court finds that no remedy is available under Title IX and § 1983, based on the facts, as alleged, in Plaintiffs' Complaint. For the reasons stated herein, the Court must dismiss Plaintiffs' Title IX and § 1983 claims against Stockton.

## C. *Vicarious Liability (Against PKP)*

Third, PKP argues that it cannot be held liable for Defendant Madle's tortious conduct under a theory of vicarious liability or <u>respondeat</u> <u>superior</u>. Specifically, PKP contends that it did not owe a duty to Plaintiffs because Madle was no longer a PKP member at the time of the alleged sexual assaults and the sexual assaults of K.S. did not happen at the PKP fraternity house.

"Whether a person owes a duty of reasonable care toward another turns on whether the imposition of such a duty satisfies an abiding sense of basic fairness under all of the circumstances in light of considerations of public policy. That inquiry involves identifying, weighing, and balancing several factors—the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution." <u>Hopkins v. Fox & Lazo Realtors</u>, 132 N.J. 426, 439 (1993)(internal

citations omitted). When conducting this analysis, [t]he foreseeability of the harm involved is one of the many considerations in assessing whether a duty is owed." <u>Peguero v. Tau Kappa Epsilon Local Chapter</u>, 439 N.J. Super. 77, 89 (App. Div. 2015). Additionally, foreseeability is "based on the defendant's knowledge of the risk of injury." <u>Id.</u>(internal citations omitted).

In <u>Peguero</u>, the Superior Court of New Jersey, Appellate Division, found that a fraternity was not liable for injuries sustained when a guest at a party fired a gun in the backyard of the fraternity house. In that case, the Superior Court found that it was not reasonably foreseeable that an "unknown assailant" would bring a gun to the party, drink heavily, get into an altercation, fire the handgun, and injure someone. <u>See id.</u> at 93. However, in dicta, the court opined that it was not suggesting that "a fraternity or its members could not be liable for criminal or other dangerous behavior that occurs during the course of a party hosted by fraternity members." <u>Id.</u> at 93. The Superior Court added that it was "cognizant of the tragic consequences of hazing, excessive drinking, sexual assaults, and other harmful acts that have occurred at fraternity houses or at other fraternity events." <u>Id.</u>

Under somewhat similar circumstances, other courts have found that national fraternities are not liable for the

tortious conduct of their members. Recently, the Middle District of Tennessee found that the national organization of the Pi Kappa Alpha fraternity was not liable for an alleged sexual assault by a fraternity member. Doe v. Andrew, 2017 WL 3443598, at *13-14 (M.D. Tenn. Aug. 9, 2017). In relevant part, the court stated:

> "The Court concludes Doe's injuries and the manner in which they occurred were not reasonably foreseeable so as to give rise to a special relationship with Doe. Certainly, a sexual assault at a fraternity party—or any party—is foreseeable, in the sense that it does not defy the rules of logic and common sense to think that it might happen. But foreseeability for purposes of identifying duties under tort law requires more than that. It requires at least reasonable foreseeability—a foreseeability built on something more than mere possibilities."
>
> ...
>
> "Here, however, there is no evidence the Chapter had notice of any sexual misconduct by any Chapter member, including Andrews. The Court agrees with the Chapter that knowledge of allegations of sexual misconduct at a few other Pi Kappa Alpha chapters was not sufficient to raise the possibility of sexual assault to such reasonable foreseeability as to give rise to a duty by the Chapter to take additional specific precautions to protect its guests, such as Doe."

Id. (emphasis in original); see also Ostrander v. Duggan, 341 F.3d 745, 749 (8th Cir.2003)(finding that the defendant fraternity had no duty to protect plaintiff from a sexual assault because the plaintiff "adduced no evidence that would cause a reasonable person to foresee injury to herself or other female visitors arising from sexual misconduct at the

[fraternity] premises"); <u>Rogers v. Sigma Chi Int'l Fraternity</u>, 9 N.E.3d 755, 765 (Ind.Ct.App.2014) (granting summary judgment to the national Sigma Chi fraternity for what it deemed to be an "unforeseeable" criminal assault of a party attendee by another guest); <u>Colangelo v. Tau Kappa Epsilon Fraternity</u>, 517 N.W.2d 289, 292 (1994) (finding that "the national fraternity owed no duty to supervise the local chapter's actions for the protection of third parties" for injuries arising from a drunk driving accident).

Plaintiffs argue that PKP's national organization was on constructive notice of sexually inappropriate conduct at the Stockton chapter because PKP "has a systematic problem of bad acts and underage drinking and either allows, encourages, or supports the continued bad acts of its members, associates, and associate chapters." <u>See</u> Pl. M.R.'s Opp. Br. at 9. This Court, however, cannot reach that conclusion based on the pleadings. In this case, Plaintiffs' complaints did not allege that the PKP national organization was on notice of any prior incidents involving sexual assaults at the Stockton PKP fraternity house.

Although Plaintiff K.S. alleges that after the sexual assaults, a PKP member told her that Madle would be banned from future parties "because of his out of control conduct," K.S. Compl. at ¶ 68, K.S. does not allege that PKP members, or the

national organization, were previously aware that Madle posed specific risk to sexually assault female party guests.

In Plaintiff M.R.'s Brief in Opposition to the MTDs [M.R. Dkt. No. 56], Plaintiff alleges for the first time that call logs from the Galloway Township Police indicate 62 calls to the Stockton PKP house since 2006, with three calls for "sexual assault/attempts." See Pl. M.R.'s Opp. Br., at 10. However, of the three police responses to sexual assaults at the PKP house, two occurred in March 2017, one occurred in February 2018, and none resulted in criminal charges. Although the reported incidents in March 2017, which occurred before the alleged sexual assaults of Plaintiff K.S., is potentially relevant – the February 2018 call has no bearing on foreseeability in this case, since it happened after all of the alleged assaults.

Plaintiff M.R.'s Brief in Opposition also attempts to argue foreseeability by referencing various PKP chapters around the country that lost university recognition. See id. at 7-10. However, of the 15 examples listed, only one, at a chapter in Florida, appears to involve a sexual assault. Furthermore, these facts and allegations were not set forth in the complaints and Plaintiffs may not amend their complaints through a response to a motion to dismiss.

Based on the facts, as currently alleged, in the respective complaints, the Court finds that dismissal of the claims against PKP is warranted for failure to state a claim under a vicarious liability theory.

### D. *Remaining State Law Claims*

In light of the Court's dismissal of all federal Title IX and Section 1983 claims in these matters, the Court notes that only the state law personal injury-related claims against Defendant Madle remain pending. Unless Plaintiffs are able to amend their respective complaints to sufficiently state federal claims, this Court will, <u>sua sponte</u>, evaluate whether to retain supplemental jurisdiction over the remaining claims. Therefore, if Plaintiffs do not file amended complaints, Plaintiffs must show cause as to why their cases should not be remanded to New Jersey state court.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, Defendants' Motions to Dismiss will be **GRANTED** and Plaintiffs' claims against the Moving Defendants will be **DISMISSED WITHOUT PREJUDICE.** Plaintiff shall be permitted thirty (30) days to either file amended complaints that address the deficiencies set forth herein, to the extent possible, or show cause as to why these cases should

not be remanded to New Jersey State Court.  Appropriate Orders
shall issue on this date.

DATED: July 31, 2019

                                    s/Renée Marie Bumb
                                    RENÉE MARIE BUMB
                                    UNITED STATES DISTRICT JUDGE